N:\wptext\02cv1791a1-ord.wpd

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

|  |  |  |
|---|---|---|
| | : | **Case No. 1:02-CV-1791** |
| **AMERICAN FAMILY LIFE** | : | |
| **INSURANCE COMPANY,** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **JUDGE O'MALLEY** |
| | : | |
| **TIMOTHY HAGAN , et al,** | : | |
| **Defendants.** | : | |
| | : | |
| | : | **MEMORANDUM AND ORDER** |
| | : | |

Plaintiff American Family Life Assurance Company of Columbus ("AFLAC") brings this action against two defendants: (1) Timothy Hagan, who is currently a candidate for Governor of the State of Ohio, and (2) the Tim Hagan for Governor Campaign (collectively, "Hagan"). AFLAC, which is a leading provider of "supplemental" insurance,[1] is the sponsor of the well-known "AFLAC Duck" commercials, in which a white duck quacks the company's name in a distinctive, nasal tone. Hagan, who is running against incumbent Governor Robert Taft, has created his own internet commercials which "borrow" from AFLAC's commercials. Specifically, Hagan's internet commercials include a crudely animated character made up of Governor Taft's head sitting on the body of a white cartoon duck; the duck quacks "TaftQuack" several times during each commercial. Hagan broadcasts these commercials at his website,

---

[1] "Primary" insurance, such as an employer-provided medical insurance policy, provides basic benefits, such as coverage for medical expenses. Supplemental insurance provides benefits covering the "gaps" created by co-payments, deductibles, loss of income, and various out-of-pocket expenses.

www.taftquack.com.[2]

In its amended complaint, AFLAC states the following claims: (1) trademark and service mark dilution, in violation of Section 43(c) of the Lanham Act, 15 U.S.C. §1125(c); (2) copyright infringement, in violation of the Copyright Act of 1976, 17 U.S.C. §101 et seq.; (3) trademark infringement, in violation of Section 32(1) of the Lanham Act, 15 U.S.C. §1114(1); (4) false designation of origin, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a); (5) unfair competition, in violation of Ohio common law; and (6) trademark and service mark dilution, in violation of Ohio common law.  Hagan has responded with counterclaims asserting that AFLAC's service marks, trademarks, and copyrights should all be declared invalid because they are generic and/or unregisterable.

On September 11, 2002, AFLAC filed a motion for temporary restraining order ("TRO"), asking the Court to enjoin, inter alia, further broadcast of the "TaftQuack" commercials and further use of the www.taftquack.com website address.  The Court held a hearing on September 18, 2002 and issued an oral ruling from the bench, denying the motion for TRO.  The Court then held a preliminary injunction hearing on October 16, 2002.  At this hearing, the parties did not adduce additional evidence.  Rather, the parties agreed that all relevant evidence had been made a part of the record as appendices to earlier-filed briefs,[3] and also agreed that there were no issues of material fact.  The parties' arguments and submissions make clear that resolution of their disagreement depends on the Court's application of the law to the

---

[2] As of the date of this Order, there are four "TaftQuack" commercials, all of which can be viewed on Hagan's website, www.taftquack.com/commercials.htm.  The commercials have also been provided to the Court on CD-ROM, and are part of the record.

[3] The only evidentiary exception was a "Hagan for Governor" brochure, which AFLAC submitted to the Court at the preliminary injunction hearing, without objection.  The brochure contains a depiction of the TaftQuack character and an invitation to visit the www.taftquack.com website.

undisputed facts.  The precise issues raised appear to be one of first impression.

For the reasons stated below, the motion for preliminary injunction is **DENIED**.  Counsel for the parties are directed to appear on November 20, 2002, at 10:00 a.m., for a status conference, to establish a discovery schedule and seta trial date.

I.  Facts.

As noted, the parties agree on the following facts.  Beginning in December of 1999, AFLAC began a television advertising campaign, the centerpiece which was a white duck quacking the name of the company in response to people discussing the subject of supplemental insurance.  AFLAC has created 11 commercials using the "AFLAC Duck," and has broadcast these commercials repeatedly during popular television viewing hours.[4]  As a result, the AFLAC Duck enjoys very high public recognition.  To protect its investment in creating and marketing the AFLAC Duck character, AFLAC applied for and received from the United States Patent and Trademark Office ("USPTO") several service marks and trademarks ("the AFLAC Duck Marks"), including service mark 2,607,415, which "consists of the sound of a duck quacking the word 'AFLAC.'" `415 mark at 1.  AFLAC has also received copyright registrations of its

---

[4]  AFLAC describes its own commercials as follows:
Each of the [AFLAC] Duck Commercials feature individuals discussing use of supplemental insurance to help pay out-of-pocket costs following an accident.  Each time supplemental insurance is mentioned or one of the individuals tries to recall AFLAC's name, the Duck supplies the answer, quacking "AFLAC" with growing annoyance each time it has to repeat AFLAC's name.  The commercials typically end with the Duck screaming "AFLAC" and engaging in some type of humorous activity.
Memo. in support of TRO at 2-3.  AFLAC states that, in 2001 alone, the AFLAC Duck commercials received over two billion television impressions.

AFLAC Duck commercials.

On November 5, 2002, Ohio voters will elect their next Governor; the principal candidates are Republican incumbent Bob Taft and Democrat challenger Tim Hagan.  Beginning in late August of 2002, as part of his campaign, Hagan began to broadcast commercials on the internet at the website address www.taftquack.com.  These commercials feature an animated character referred to as "TaftQuack." TaftQuack consists of Governor Taft's head on the body of a white duck; a yellow duck's bill sits where Governor Taft's mouth should be.  In some commercials, the TaftQuack character is asked questions; his response is to quack the word "Duck," hide for a moment, and then quack "TaftQuack."  In other commercials, the TaftQuack character views several segments of Governor Taft's own political commercials and responds to each segment by quacking "TaftQuack."  Whenever the TaftQuack character speaks, a cartoon speech balloon appears containing the same words, in writing, that are spoken.  The duck's "TaftQuack" sound is highly reminiscent of the "AFLAC" sound made by the AFLAC Duck.[5]  To date, Hagan has created and broadcast four such commercials.

In addition to the www.taftquack.com website, Hagan also operates a website at the address www.timhaganforgovernor.com.  This latter website is more staid, and the TaftQuack commercials do not appear there; however, the www.timhaganforgovernor.com website does contain a link to www.taftquack.com.  Similarly, the www.taftquack.com website contains a link titled "to make a contribution, click here;" by clicking on the link, the user is directed to www.timhaganforgovernor.com, where the user can make a contribution online.  Thus, it is fair to say that Hagan uses the

---

[5]  To quote the unintended pun of AFLAC's counsel, the TaftQuack character "obviously attempted to parrot" the sound of the AFLAC Duck.  Injunction hearing tr. at 17.

www.taftquack.com website to solicit campaign contributions.

AFLAC asserts that Hagan has purposefully "created the TaftQuack character to increase Hagan's voter recognition by trading on the substantial consumer recognition and goodwill of the famous AFLAC Duck." Memo. in support of TRO at 4-5. By doing so, AFLAC argues, Hagan "appropriated" the AFLAC Duck Marks, causing AFLAC to suffer loss of "control over the goodwill it has labored at great effort and expense to build." Id. at 1. AFLAC also adds that Hagan's TaftQuack commercials have "tarnishe[d] the AFLAC [Duck Marks] by politicizing what is designed to be an apolitical character and by associating the character in the minds of the consuming public with a candidate and political views that AFLAC neither sponsors nor endorses." Id. at 1-2. Accordingly, AFLAC asks the Court to issue a preliminary injunction enjoining further use by Hagan of the TaftQuack character and associated website address.

II. Analysis.

A. Standards for Relief.

A preliminary injunction is a provisional remedy authorized under Fed. R. Civ. P. 65. It is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 117 S. Ct. 1865, 1867 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2948 at 129-130 (2nd ed.1995)). When ruling on a motion for a preliminary injunction, "a district court must consider and balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause

substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction."  <u>Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n</u>, 110 F.3d 318, 322 (6th Cir. 1997).

"It is important to recognize that the four considerations applicable to preliminary injunctions are factors to be balanced and not prerequisites that must be satisfied.  These factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements."  <u>In re Eagle-Picher Indus., Inc.</u>, 963 F.2d 855, 859 (6th Cir. 1992).  Thus, "the degree of likelihood of success required may depend on the strength of the other factors."  <u>In re DeLorean Motor Co.</u>, 755 F.2d 1223, 1229 (6th Cir. 1985).  "In general, the likelihood of success that need be shown (for a preliminary injunction) will vary inversely with the degree of injury the plaintiff will suffer absent an injunction."  <u>Friendship Materials, Inc. v. Michigan Brick, Inc.</u>, 679 F.2d 100, 105 (6th Cir. 1982) (citation omitted).

The Court takes pains to add here that one factor having <u>absolutely nothing</u> to do with whether AFLAC is entitled to the preliminary injunctive relief it seeks is the substantive content of the speech contained in the TaftQuack commercials.  The political points made on Hagan's website are, of course, completely irrelevant to the question of whether AFLAC's motion is well-taken.  Indeed, AFLAC takes this position itself.[6]

### B. Idiosyncracies of this Case.

---

[6]  As AFLAC explained during oral argument at the TRO hearing: "This case is not about politics.  AFLAC has no candidate in the race for Governor in the State of Ohio.  This is purely a case to protect trademark rights."  TRO tr. at 9.

Before turning to an analysis of the four factors listed above, it is worth noting the factual and legal issues that are **not** raised in this case, as currently postured.  It is partly because of issues not present in this case that it is, apparently, one of first impression.

First, this is not a case where the defendant is using a website address that is easily mistaken for the website address of the plaintiff.  That is, Hagan is not using, for example, www.aflac.org as his own web address, thereby "tricking" or detouring users looking for information about AFLAC into reading the information at his own website.  Cf. Jews For Jesus v. Brodsky, 993 F. Supp. 282 (D. N.J. 1998), affirmed, 159 F.3d 1351 (3rd Cir. 1998) (table) (a non-profit organization known as "Jews for Jesus" successfully sought an injunction against an individual who registered the website address "jewsforjesus.org"); Planned Parenthood Federation of America, Inc. v. Bucci, 1997 WL 133313 (S.D.N.Y. Mar. 24, 1997), affirmed, 152 F.3d 920 (2nd Cir. 1998) (table), cert. denied, 525 U.S. 834 (1998) (plaintiff successfully sought an injunction against an individual who registered the website address "www.plannedparenthood.com").

Second, the TaftQuack commercials make absolutely no mention of AFLAC, its business practices, or the insurance products that it sells.  Thus, Hagan does not (and cannot) assert that the TaftQuack commercials are a parody of AFLAC or the AFLAC Duck commercials.  See Dr. Seuss Enterps., L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1398 (9th Cir. 1997) (citing Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 580 (1994) (in parody, "the copyrighted work is the target"); cf. L.L. Bean, Inc. v. Drake Publishers, Inc., 811 F.2d 26 (1st Cir. 1987), cert. denied, 483 U.S. 1013 (1987) (plaintiff sued based on defendant's sexually explicit, noncommercial parody of plaintiff's trademark).

7

And third, there is at least one aspect to this case that makes it different from virtually any other the Court can find: the alleged infringer is a politician in the midst of a campaign, and he is using the allegedly infringing materials in furtherance of that campaign.  Only one other case cited by the parties has any apparent factual similarity, and it is still unresolved; although the court in that case denied a motion for TRO, it has not issued any substantive written opinion.  See MasterCard Int'l, Inc. v. Nader 2000 Primary Comm., Inc., case no. 00-CV-6068 (S.D.N.Y) (defendants' summary judgment motion pending) (presidential candidate Ralph Nader broadcast a television commercial with the tag-line "Finding out the truth: Priceless.  There are some things money can't buy.  Without Ralph Nader in the presidential debates, the truth will come in last.  Find out how you can help.  Go to voteNader.com.").

Thus, while the cases cited by the parties are instructive, none is "on all fours with the instant case." Gosa v. Mayden, 413 U.S. 665, 687 (1973) (Douglas, J., concurring).


C. Likelihood of Success on the Merits.

The first factor the Court must examine to determine the propriety of granting to AFLAC the requested injunctive relief is the likelihood of success on the merits.  This factor is critical, because, "[a]lthough no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal."  Gonzales v. National Bd. of Medical Examiners, 225 F.3d 620, 625 (6th Cir. 2000), cert. denied, 532 U.S. 1038 (2001).


1. Claims for Copyright Infringement, Trademark Infringement, False Designation, and Unfair Competition.

8

The claims brought by AFLAC in this case may be divided into two categories: (1) claims for trademark and service mark dilution; and (2) everything else, which includes claims for copyright infringement, trademark infringement, false designation, and unfair competition (collectively, "infringement-type claims").  The latter group of claims all have in common a single element – to prevail, the plaintiff must show a similarity between the plaintiff's and defendant's works substantial enough to cause confusion.  See Brach Van Houten Holding, Inc. v. Save Brach's Coalition for Chicago, 866 F. Supp. 472, 475 ("[g]enerally, the same facts that support a trademark infringement claim support an unfair competition claim as well").

Specifically, to establish copyright infringement, a plaintiff must show: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991).  "Direct evidence of copying is rare, so frequently the plaintiff will attempt to establish an inference of copying by showing: (1) access to the allegedly-infringed work by the defendant(s) and (2) a substantial similarity between the two works at issue."  Ellis v. Diffie, 177 F.3d 503, 506 (6th Cir. 1999) (emphasis added).

Similarly, "[t]he touchstone of liability [for trademark infringement] is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties."  Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center, 109 F.3d 275, 280 (6th Cir. 1997) (emphasis added).  Two critical factors in determining whether the disputed mark is likely to cause confusion are the "similarity of the marks" and "evidence of actual confusion."  Id. (emphasis added).

In the same way, "[a] Lanham Act claim for false designation of origin must contain two elements:

9

(1) the false designation must have a substantial economic effect on interstate commerce; and (2) the false designation must create a likelihood of confusion." Johnson v. Jones, 149 F.3d 494, 502 (6th Cir. 1998) (emphasis added).  And under Ohio law, "in a suit for unfair competition to enjoin the use of a similar trademark, trade dress or advertising design, plaintiff must prove two elements: secondary meaning and likelihood of confusion." George P. Ballas Buick-GMC, Inc. v. Taylor Buick, Inc., 449 N.E.2d 805, (Ohio Ct. Com. Pl. 1981), affirmed, 449 N.E.2d 503 (Ohio Ct. App. 1982) (citing Mr. Gasket Co. v. Travis, 299 N.E.2d 906, 915 (Ohio Ct. App. 1973)) (emphasis added).

In other words, to show a likelihood of success on any one of its claims for copyright infringement, trademark infringement, false designation, or unfair competition, AFLAC must present evidence that "[Hagan's] design so resembles [AFLAC'S] marks that it is likely to cause confusion among consumers as to whether [AFLAC] has sponsored, endorsed, or is otherwise affiliated with [Hagan's] design." Mutual of Omaha Ins. Co. v. Novak, 836 F.2d 397, 398 (8th Cir. 1987).

"Likelihood of confusion is a question of fact." Save Brach's, 856 F. Supp. at 475.  For the purposes of ruling on the current motion, the Court adopts the "confusion standard" most favorable to AFLAC – "confusion should be measured based on an initial understanding, rather than an understanding that may develop after careful reading of the material." Save Brach's, 856 F. Supp. at 475.  This "expansive interpretation of the likelihood of confusion" extends protection "against use of [AFLAC's] mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." Anheuser-Busch, Inc. v. Balducci Publications, 28 F.3d 769, 774 (8th Cir. 1994) (quoting McCarthy, Trademarks & Unfair Competition §24.03 at 24-13 (3rd ed. 1992)).  On the other hand, "substantial

10

similarity" refers to similarity of expression, not merely similarity of ideas or concepts.  17 U.S.C. § 102(b).

Most courts use "some form of bifurcated test to demonstrate 'substantial similarity,' inquiring first if there is copying and second if an audience of reasonable persons will perceive substantial similarities between the accused work and protected expression of the copyrighted work."  Dr. Seuss Enterps., L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1398 (9th Cir. 1997).  "There are at least three types of proof of likelihood of confusion: (1) survey evidence; (2) evidence of actual confusion; and (3) an argument based on an inference arising from a judicial comparison of the conflicting marks themselves and the context of their use in the marketplace."  Id. at 1404 n.14.  Put differently, a court should examine the following factors "pertinent to the finding of likelihood of confusion:" "(1) the strength of the trademark; (2) the similarity between the plaintiff's and defendant's marks; (3) the competitive proximity of the parties' products; (4) the alleged infringer's intent to confuse the public; (5) evidence of any actual confusion; and (6) the degree of care reasonably expected of the plaintiff's potential customers."  Balducci, 28 F.3d at 774.

At the TRO hearing, the Court concluded that AFLAC had not shown a likelihood of success on any of its infringement-type claims, because AFLAC had not shown any likelihood of confusion.  The Court stated that it "d[id] not accept the proposition asserted by [AFLAC] that it is likely that members of the community will be confused as to the source of [Hagan's] ads, or as to an issue of endorsement by [AFLAC] of [Hagan's] ads, or of [Hagan] generally as a candidate."  TRO tr. at 50.  The Court also concluded that "the copyright marks are very distinctive displays of the AFLAC symbol and the Court does not believe that there is a substantial similarity between those particular displays and [Hagan's] commercials that are at issue here."  Id. at 51.  The Court's conclusion remains unchanged following the preliminary

11

injunction hearing.

AFLAC did not present any evidence of actual confusion at the TRO hearing or the preliminary injunction hearing. Furthermore, although AFLAC suggested it would submit survey evidence at the preliminary injunction hearing, it did not have time to complete the survey and presented no survey evidence. Injunction hearing tr. at 44-45.[7] Thus, AFLAC's evidence of confusion consists simply of its own works and Hagan's works; AFLAC asks for a favorable "inference arising from a judicial comparison of the conflicting marks themselves and the context of their use in the marketplace." Dr. Seuss, 109 F.3d at 1404 n.14.

Having carefully reviewed this evidence, the Court believes there is no substantial likelihood that reasonable members of the public will perceive Hagan is "affiliated with, connected with, or sponsored by" AFLAC. Balducci, 28 F.3d at 774. First, the degree of similarity between Hagan's and AFLAC's marks is really quite low. The AFLAC Duck appearing in AFLAC's commercials is very realistic. It appears that some of the images of the AFLAC Duck were made using a real duck, and some of the images were made using an animatronic robot and/or computer simulation; the simulated images are so convincing that they almost fool the viewer into thinking that all of the images of the AFLAC Duck are real.[8] In contrast, the TaftQuack character is a crudely drawn, one-dimensional, satyr-like cartoon animal, with the body and

---

[7] AFLAC did state at the preliminary injunction hearing that it expected to submit survey evidence at trial, and a well-conducted survey could conceivably strengthen its position. But see Mutual of Omaha, 836 F.2d at 401-02 (discussing cases where survey evidence was given little weight because of poor design and doubtful validity); id. at 404 (Heaney, J., dissenting) (criticizing survey evidence).

[8] The parties did not submit any evidence on this question, although Hagan suggested in its briefs that some of the images of the AFLAC Duck were created by using a robotic white duck that is identical to, and perhaps even the same as, "Ferdinand the Duck," a talking character played by a robotic white duck in the 1995 film Babe.

beak of a duck and the head of Bob Taft.  TaftQuack's movements are limited to jerky tiltings of the head and spasmodic flapping of the beak and wings.  Indeed, in only one aspect are the artistic expressions of the AFLAC Duck and TaftQuack acutely similar: the sound they make.  The AFLAC Duck quacks the company's name, while TaftQuack quacks its own name; both are two-syllable neologisms containing the "aff" and "ack" phonemes.  Even here, however, whenever the TaftQuack character quacks its name, a cartoon speech balloon appears containing the word "TaftQuack."  This balloon makes it even more clear to a reasonable viewer that TaftQuack is not saying "AFLAC" and is not the AFLAC Duck.[9]

In addition to the pronounced dissimilarity in appearance between the AFLAC Duck and TaftQuack, there is little "competitive proximity" between AFLAC's insurance products and Hagan's campaign for governor.  Balducci, 28 F.3d at 774.  Moreover, it does not appear to the Court, on the evidence so far presented, that Hagan had an "intent to confuse the public."  Id.  The Court **is** convinced that, with his creation of the TaftQuack character, Hagan intended to "imitate [the AFLAC Duck], so [he] could derive parasitic value from it," but the Court does not find any evidence of an intent to confuse or deceive.  Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc., 600 F.2d 1184, 1188 (5th Cir. 1979).

The Court is mindful that "the Lanham Act is concerned not only with confusion over the source of goods but also with deceptive appearances of approval."  Save Brach's, 856 F. Supp. at 475 (citing 15 U.S.C. §1125).  But the Court remains convinced that, given the evidence of record so far adduced,

---

[9] Thus, although the Court does find Hagan engaged in some "copying" or "palming off" of the AFLAC Duck Marks, the expressive elements (as opposed to ideas or concepts) that Hagan copied are actually quite limited.

there is no likelihood that the public will believe that AFLAC has endorsed Hagan, nor that the public will be confused as to the source of Hagan's advertisements.  In sum, the Court finds no evidence upon which it can conclude that AFLAC can prevail upon the necessary "confusion" element of its four infringement-type claims.  Accordingly, AFLAC has shown no likelihood of success on the merits of its claims for copyright infringement, trademark infringement, false designation, and unfair competition.

### 2. Claims for Trademark and Service Mark Dilution.

In addition to its infringement-type claims, AFLAC asserts claims for trademark and service mark dilution, in violation of both state and federal law.  In "contrast to trademark infringement, the injury from dilution usually occurs when consumers <u>aren't</u> confused about the source of the product."  <u>Mattel, Inc. v. MCA Records</u>, 296 F.3d 894, 903 (9th Cir. 2002) (emphasis in original).  Rather, dilution occurs when an entity appropriates another's trademark for its own uses, so that the trademark "bring[s] to mind two products, not one."  <u>Id.</u>  Dilution can cause two different, deleterious effects on a trademark: blurring and tarnishment.  Blurring occurs when "a prospective customer sees the plaintiff's mark used by another person to identify different sources of different goods and services, thus weakening the distinctive significance of the mark to identify and distinguish the source."  <u>Jews for Jesus v. Brodsky</u>, 993 F. Supp. 282, 306 n.30 (D. N.J. 1998).  Tarnishment occurs when "a party's unauthorized use of a famous mark is linked to products of poor quality or is portrayed in an unwholesome manner and therefore degrades the positive associations and the distinctive quality of the mark.  <u>Id.</u> at 306 n.31.  An example of blurring would be a merchant selling "Tylenol snowboards."  <u>Mattel</u>, 296 F.3d at 903.  An example of tarnishment would be a merchant using "Tylenol.com" for a sexually explicit website address.  <u>Hasbro, Inc. v. Internet</u>

14

Entertainment Group, Ltd., 1996 WL 84853 at *1 (W.D. Wash. Feb. 9, 1996); see Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200 (2nd Cir. 1979) (finding dilution when defendant used plaintiff's trademarked cheerleading uniform in the sexually explicit film "Debbie Does Dallas").

      To prove a dilution claim under federal law, "a plaintiff must provide sufficient evidence that (1) the mark is famous; (2) the alleged infringer adopted the mark after the mark became famous; (3) the infringer diluted the mark; and (4) the defendant's use is commercial and in commerce." Syndicate Sales, Inc. v. Hampshire Paper Corp., 192 F.3d 633, 639 (7th Cir. 1999) (citing 15 U.S.C. §1125(c)); K'Arsan Corp. v. Christian Dior Perfumes, Inc., 1998 WL 777987 at *3 (6th Cir. Oct 21, 1998).  Federal law also explicitly exempts from coverage three uses of trademark that, though potentially dilutive, are nevertheless permitted: comparative advertising; news reporting and commentary; and noncommercial use. 15 U.S.C. § 1125(c)(4)(B).  Under Ohio law, only the first three elements are required, and there are no express exemptions from coverage.  Jet, Inc. v. Sewage Aeration Sys., 165 F.3d 419, 424 (6th Cir. 1999) (citing Ameritech, Inc. v. American Info. Techs Corp., 811 F.2d 960, 965 (6th Cir. 1987)).  On the other hand, under Ohio law, "[t]he degree of similarity required for a dilution claim must be greater than that which is required to show likelihood of confusion." Id. at 425.  As noted by the Sixth Circuit Court of Appeals, in the context of analyzing an Ohio trademark dilution claim, "states generally require marks in a dilution case to be 'virtually identical.'" Id. (quoting 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §24:90.1 (4th ed. 1997)).

      At the TRO hearing, the Court addressed the first three prongs of AFLAC's federal trademark dilution claim and concluded that, "for the purposes of these proceedings, [AFLAC] has established a

likelihood of success on all [three] elements." TRO tr. at 50.[10]  Specifically, the Court found that: (1) AFLAC's marks were famous; (2) Hagan began using the TaftQuack marks after (and, indeed <u>because</u>) AFLAC's marks were famous; and (3) Hagan's use of the TaftQuack character posed a significant threat of "blurring and the loss of strength" of AFLAC's marks.  <u>Id.</u>  The Court further found, however, that AFLAC's dilution claim "fails on the commercial purposes prong."  <u>Id.</u>  Having now had the benefit of additional briefing and argument from the parties at the preliminary injunction hearing, as well as more time for analysis, the Court reaffirms its conclusion that there is no likelihood that AFLAC can prevail at trial on its dilution claims, although for, in some respects slightly different reasons than expressed on the record at the TRO hearing.[11]

Hagan provides several arguments as to why he believes AFLAC cannot succeed on its dilution claims.  First, Hagan argues that AFLAC's <u>state law</u> trademark dilution claim must fail because the TaftQuack character and <u>www.taftquack.com</u> are not "virtually identical" to the AFLAC Duck, <u>www.aflac.com</u>, or any other mark owned by AFLAC.  As noted above, the Court agrees with Hagan that the marks in question are not so similar that they would cause confusion among reasonable consumers.  Given that, under Ohio law, "[t]he degree of similarity required for a dilution claim must be greater than that

---

[10]  AFLAC's original complaint stated a claim for trademark dilution only under federal law, not state law.  After the Court ruled on AFLAC's motion for TRO, the Court granted AFLAC's motion to amend its complaint to add a claim for trademark dilution under state law.

[11]  As discussed below, while the Court's focus at the TRO hearing was primarily on the "noncommercial use" exemption under the Lanham Act, it mistakenly referred to that issue as falling under the fourth element of a prima facie dilution claim.  To the extent the Court did so, it mis-spoke.  The Court has no doubt, and has never had any doubt, that AFLAC can satisfy the "in commerce" element of its federal law trademark dilution claim, which is essentially the jurisdictional predicate for this claim.  Where AFLAC fails is in its ability to survive the "noncommercial use" exemption under the Act.

which is required to show likelihood of confusion," the Court also agrees that AFLAC cannot prevail on

its Ohio dilution claim.  Jet, Inc., 165 F.3d at 424.  It is true, as AFLAC notes, that: (1) the Court earlier

found a likelihood that AFLAC would succeed on proving the first three elements of its federal law dilution

claim, and (2) AFLAC's state law dilution claim requires proof of only the first three elements of a federal

law dilution claim.  Obviously, this is why AFLAC moved to amend its complaint to add the state law claim.

But the level of proof required to show the third prong – that the infringer diluted the mark – is much more

stringent under state law.  Dilution under federal law, unlike Ohio law, does not require a showing that the

marks are "virtually identical."  As noted below, however, even if Ohio law did not require the marks to

be "virtually identical," the Court would still conclude AFLAC's state law dilution claim fails because its

application in this context would run afoul of the First Amendment.

Hagan next argues that AFLAC's federal law trademark dilution claim fails because his use of the

TaftQuack character and www.taftquack.com has nothing to do with making a profit, and therefore is not

"commercial and in commerce."  15 U.S.C. §1125(c)(1).  The Court does not agree.  It is true that, most

often, trademark dilution claims are brought by the purveyor of one product or service against another.

But it is clear that the use of trademarks is not limited to profit-seeking merchants: one court observed, over

15 years ago, that "[c]ommercial advertising slogans, which can be registered as trademarks, have become

part of national political campaigns."  L.L. Bean, Inc. v. Drake Publishers, Inc., 811 F.2d 26, 28 (1st Cir.

1987).[12]  Thus, "the Lanham Act has been applied to political organizations" in several cases.  United We

---

[12] The L.L. Bean court was surely referring to a question posed by Vice President Walter Mondale to Senator Gary Hart during the 1984 Democratic presidential primary, which Mondale borrowed from a commercial for Wendy's Old Fashioned Hamburgers Restaurants: "Where's the beef?"

Stand America, Inc. v. United We Stand, America New York, Inc. 128 F.3d 86, 90 (2nd Cir. 1997).

Specifically, in these cases, the Lanham Act has been invoked successfully by and against parties engaged

primarily in dissemination of political messages.  See id. (plaintiff successfully sued defendant, a competing

political organization, for using plaintiff's service mark "United We Stand America," originally used by Ross

Perot in his 1994 presidential campaign);[13]  Planned Parenthood, 1997 WL 133313 at *1 (plaintiff

successfully  sought an injunction against a political activist who used plaintiff's mark deceitfully to attack

plaintiff's position on abortion); Jews For Jesus, 993 F. Supp. at 308 (same, defendant attacked plaintiff's

position on Jewish conversion); Save Brach's, 856 F. Supp. at 475 (the court enjoined the defendant from

using plaintiff's mark in a campaign to keep plaintiff from closing its factory); MGM-Pathe Communications

Co. v. The Pink Panther Patrol, 774 F. Supp. 869 (S.D.N.Y 1991) (the court enjoined the defendant from

using "The Pink Panther" trademark to promote gay rights); Tomei v. Finley, 512 F. Supp. 695 (N.D. Ill.

1981) (enjoining Democrats in historically Republican township from identifying themselves using the

---

[13]  The United We Stand America court's description of the defendant in that case is also
applicable to Hagan:

> UWSANY was incorporated "to solicit, collect and otherwise raise money" in support of
> the presidential candidacy of Ross Perot.  Since its incorporation, it has engaged in political
> organizing; established and equipped an office; solicited politicians to run on the
> UWSANY slate; issued press releases intended to support particular candidates and
> causes; endorsed candidates; and distributed partisan political literature.  These are the
> services characteristically rendered by a political party to and for its members, adherents,
> and candidates.  Although not undertaken for profit, they unquestionably render a service.
> We have no doubt that they satisfy §1114(1)(a)'s requirement that the mark be used in
> connection with goods or services.

United We Stand America, 128 F.3d at 90.

acronym "REP," for "Representation for Every Person Party").[14]

Put simply, the "commercial and in commerce" provision contained in 15 U.S.C. §1125(c)(1) "denotes Congress's authority under the Commerce Clause, rather than an intent to limit the [Lanham] Act's application to profitmaking activity." United We Stand America , 128 F.3d at 92-93; see Planned Parenthood, 1997 WL 133313 at *3 ("commercial and in commerce" requirement of §1125(c) "is a jurisdictional predicate to any law passed by Congress"). The scope of this jurisdictional predicate "is broad and has a sweeping reach." Planned Parenthood, 1997 WL 133313 at *3. Thus, courts have concluded that "a group engaging in soliciting donations, preparing press releases, holding public meetings and press conferences, and organizing on behalf of its members' interests was performing 'services' withing the meaning of the Lanham Act." United We Stand America, 128 F.3d at 90 (citing Save Brach's, 856 F. Supp. at 475-76); see N.A.A.C.P. v. N.A.A.C.P. Legal Defense and Educational Fund, Inc., 559 F. Supp. 1337, 1342 (D.D.C. 1983), reversed on other grounds, 753 F.2d 131 (D.C. Cir. 1985), cert. denied, 472 U.S. 1021 (1985) (Lanham Act remedies are "as available to public service organizations as to merchants and manufacturers"). As the Supreme Court has noted, the Lanham Act defines "commerce" as "all commerce which may lawfully be regulated by Congress," thereby "confer[ring] broad jurisdictional powers upon the courts of the United States." Steele v. Bulova Watch Co., 344 U.S. 280, 283-84 (1952) (quoting 15 U.S.C. §1127). The Court easily concludes that Hagan's use of the TaftQuack marks meets

_____

[14] As best the Court can tell, however, this is the first time a federal court has ruled in a case where a commercial plaintiff has brought suit under the Lanham Act against an individual politician in the midst of a political campaign. While both the plaintiff and defendant in United We Stand America, and also in Finley, were political organizations, the trademarks at issue were not owned by a merchant nor being used solely by an individual politician during a campaign.

this jurisdictional predicate and is, therefore, "a commercial use in commerce" under the Lanham Act.

Next, Hagan argues that AFLAC's federal dilution claim fails because the speech in which Hagan is engaged is explicitly exempted from the reach of the anti-dilution provision of the Lanham Act. Specifically, the Act provides that a dilutive use of a mark is prohibited <u>unless</u> the defendant is engaging in "[n]oncommercial use of [the] mark." 15 U.S.C. §1125(c)(4)(B).[15]  Hagan insists that his uses of the TaftQuack marks are "noncommercial" within the meaning of this provision, because he is engaged in what is, at its core, political speech.

As courts have noted, the "noncommercial use" exemption codified at §1125(c)(4)(B) "presents a bit of a conundrum because it seems at odds with the earlier requirement [recited at §1125(c)(1)] that the junior use be a 'commercial use in commerce.'  If a use has to be commercial in order to be dilutive, how then can it also be noncommercial so as to satisfy the exception of section 1125(c)(4)(B)?" <u>Mattel</u>, 296 F.3d at 904.  The answer to this question is that, when Congress passed the Federal Trademark Dilution Act ("FTDA"), it used the phrase "noncommercial use" as a somewhat inexact, shorthand reference to "speech protected by the First Amendment."

This conclusion is derived by examining the legislative history of the FTDA, which the <u>Mattel</u> court did in detail.  Among other "particularly persuasive" statements made by Congress regarding the "noncommercial use" exemption, the <u>Mattel</u> court noted that "sponsors in each house explained that the proposed law 'will not prohibit or threaten noncommercial expression, such as parody, satire, editorial and

---

[15]  The Lanham Act also provides exemptions for two other uses that, "though potentially dilutive, are nevertheless permitted:" comparative advertising, and news reporting and commentary.  15 U.S.C. §1125(c)(4)(A, C).  <u>Mattel</u>, 296 F.3d at 904.  These other exemptions do not apply to the facts of this case.

other forms of expression that are not a part of a commercial transaction.'" Id. at 905 (citing 141 Cong. Rec. S19306-10, S19310 (daily ed. Dec. 29, 1995) (statement of Sen. Hatch); 141 Cong. Rec. H14317-01, H14318 (daily ed. Dec. 12, 1995) (statement of Rep. Moorhead)).  Both the Senate and the House noted that the exemption was designed to "recognize[] that the use of marks in certain forms of artistic and expressive speech is protected by the First Amendment."  Id. (citing 141 Cong. Rec. S19306-10, S19311 (daily ed. Dec. 29, 1995)).  As examples of "noncommercial" speech protected by the First Amendment, Congress explicitly mentioned "parody, satire, [and] editorial . . . forms of expression."  Id.

At the preliminary injunction hearing, there was significant discussion regarding the precise scope of the "noncommercial use" exemption codified at §1125(c)(4)(B).  On the one hand, Congress could have intended this exemption to exclude any speech that does not solely and entirely constitute "commercial speech," within the meaning of the First Amendment.  The Mattel court adopted this view, concluding that, "[i]f speech is not 'purely commercial' – that is, if it does more than propose a commercial transaction" – then it falls squarely within the exemption of §1125(c)(4)(B) and is not actionable under the federal dilution laws, no matter how dilutive its effect.  Mattel, 296 F.3d at 905-06.[16]

On the other hand, Congress could have intended this exemption to be applied more narrowly.  As AFLAC's counsel argued at the injunction hearing, if Congress was concerned about the First Amendment when passing §1125(c)(4)(B), this Court should assume that Congress intended to import in

---

[16] Indeed, in Mattel, Judge Kozinski concluded that the "noncommercial use" exemption applied to the sale of the song "Barbie Girl," despite the song's obvious commercial purpose, because use of the otherwise protected trademark in the song had an expressive purpose as well.

21

toto all First Amendment case law into that exemption. Thus, AFLAC contends, the inquiry under the exemption should not be simply whether Hagan was engaged in something other than pure commercial speech, but whether use of the TaftQuack marks in the context of that alternative form of expression is otherwise protectable under traditional First Amendment principles. AFLAC contends, moreover, that, when a defendant engages in speech which has both commercial <u>and</u> noncommercial elements to it (as in <u>Mattel</u>), the exemption should not apply.[17]

This Court is inclined to conclude that AFLAC's argument that the exemption should be read narrowly is unavailing, and the <u>Mattel</u> court's reading of the noncommercial use exemption is better reasoned. This inclination has several bases. First, if Congress meant to incorporate into the noncommercial use exemption <u>all</u> First Amendment case law as it existed at the time, then Congress did not need to say anything at all – it is fundamental that a statute enacted by Congress cannot override basic protections contained in the Bill of Rights. Second, as noted by the <u>Mattel</u> court, expressive speech that results in trademark dilution is different and less worthy of First Amendment protection than expressive speech that results in trademark infringement. Trademark infringement law "grants relief only against uses that are likely to confuse," while dilution law "seeks to protect the mark from association in the public's mind with wholly unrelated goods and services." <u>Mattel</u>, 296 F.3d at 904. For this reason, "[a] dilution

---

[17] For this latter point, AFLAC relies primarily upon the district court decisions in <u>Planned Parenthood</u>, 1997 WL 133313, and <u>Jews for Jesus</u>, 993 F. Supp. 282. While the Court is inclined to believe that the anti-dilution aspects of those decisions reads the noncommercial exemption in §1125(c)(4)(B) too narrowly, as discussed below, the Court finds those cases distinguishable from this one for other reasons. The Court notes, moreover, that the anti-dilution holdings in those cases were unnecessary to reach the results achieved; the primary basis for the holdings in both cases was a finding of blatant trademark <u>infringement</u>.

injunction, by contrast to a trademark injunction, will generally sweep across broad vistas of the economy."
Id.  Because trademark infringement causes consumer confusion, an injunction "avert[s] what is essentially
a fraud on the consuming public."  Id.  This is "wholly consistent with the theory of the First Amendment,
which does not protect commercial fraud."  Id.  Trademark dilution does not require a showing of
confusion, so dilution injunctions "lack the built-in First Amendment compass of trademark injunctions.  In
addition, dilution law protects only the distinctiveness of the mark, which is inherently less weighty than the
dual interest of protecting trademark owners and avoiding harm to consumers that is at the heart of every
trademark claim."  Id.  Given that First Amendment concerns are greater in cases of infringement than in
cases of dilution, Congress could very well have meant to sweep more broadly with its noncommercial use
exemption than AFLAC contends.

If the Court were to apply the reasoning of Mattel, Hagan's speech clearly would be
"noncommercial," because it does "more than propose a commercial transaction" – it discusses public
issues and challenges the qualifications of a political candidate.  Indeed, it is arguable whether Hagan's
speech proposes a commercial transaction at all.  AFLAC notes that Hagan includes a mechanism, at
www.taftquack.com, for website visitors to donate money to his campaign.  But "[political campaign]
contribution and expenditure limitations operate in an area of the most fundamental First Amendment
activities."  Buckley v. Valeo, 424 U.S. 1, 14 (1976).  Hagan's solicitation of contributions, and the making
of those contributions by visitors to the www.taftquack.com website, is much more than merely a
commercial transaction.  Indeed, this exchange is properly classified not as a commercial transaction at all,
but completely noncommercial, political speech.  Federal Election Com'n v. Colorado Republican Federal
Campaign Committee, 533 U.S. 431, 440 (2001) ("Spending for political ends and contributing to political

23

candidates both fall within the First Amendment's protection of speech and political association").

Furthermore, the Court does not accept AFLAC's argument that an injunction is appropriate because Hagan could still express his views without using the TaftQuack marks. Some courts have ruled that "trademarks are property rights and as such, need not "yield to the exercise of First Amendment rights under circumstances where alternative avenues of communication exist." Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 206 (2nd Cir. 1979) (quoting Lloyd Corp. v. Tanner, 407 U.S. 551, 567 (1972)); see Mutual of Omaha, 836 F.2d at 402 (relying on Pussycat Cinema); Save Brach's, 856 F. Supp. at 476 (same); L.L. Bean, 625 F. Supp. at 1537 (same). All of these cases rely on Lloyd, 407 U.S. 551, where the Supreme Court held that the owner of real property has the right to exclude unwelcome speakers. But "the first amendment issues involved [in a trademark case] . . . cannot be disposed of by equating the rights of a trademark owner with the rights of an owner of real property." L.L. Bean, 811 F.2d at 29. Indeed, to do so is "dangerously simplistic." Id. (citing Denicola, Trademarks As Speech: Constitutional Implications of the Emerging Rationales for the Protection of Trade Symbols, 1982 Wis. L. Rev. 158, 206 (1982)); see Mutual of Omaha, 836 F.2d at 405 (Heaney, J., dissenting) (canvassing the scholarly criticism of the Pussycat Cinema analysis). The "alternative avenues" argument asserted by AFLAC is "inappropriate . . . [because] the property involved is not real estate but a trademark – a form of intangible property that itself conveys or symbolizes ideas." Mutual of Omaha, 836 F.2d at 405 (Heaney, J., dissenting). This is particularly true, moreover, when the trademark right at issue is the right to be free of a dilutive effect, rather than the right to resist wholesale misappropriation of one's mark.

Ultimately, in the context of the particular facts of this case, the Court finds that the question of how

broadly it should interpret the "noncommercial use" exemption is irrelevant.  Regardless of how narrowly

the noncommercial use exemption is interpreted, the First Amendment guarantee that catalyzed the

exemption "has its fullest and most urgent application precisely to the conduct of campaigns for political

office."  Buckley v. Valeo, 424 U.S. 1, 15 (1976).  If parody is protected by the noncommercial use

exemption, then political speech certainly is.  See L.L. Bean, 811 F.2d at 34 (refusing to enjoin a non-

commercial parody that used plaintiff's mark, and noting: "[w]hile [the parody] lacks explicit political

content, that is no reason to afford it less protection under the first amendment").  Even if this Court were

to use a more narrow interpretation of the exemption codified at §1125(c)(4)(B) than did the Mattel court,

the Court would still conclude that the exemption does apply.[18]

As AFLAC notes, a number of courts in cases involving political organizations have issued

injunctions, even though the defendant was engaged in political speech.  For example, even though the

defendant in Planned Parenthood used the plaintiff's mark because he wanted his "anti-abortion message

to reach as many people as possible, and particularly the people who do not think that abortion has an

inimical effect on society," the court enjoined the defendant from infringing plaintiff's mark.  Planned

Parenthood, 1997 WL 133313 at *2.  Similarly, even though the defendant in United We Stand America

---

[18]    Although the Mattel court did not mention it, it is also notable that Congress had earlier
addressed First Amendment issues in relation to the Lanham Act when, in 1988, it amended 15 U.S.C.
§1125(a), the Act's provisions regarding false designation.  Section 1125(a) prohibits persons from
engaging in "false designation of origin . . . in commercial advertising or promotion."  15 U.S.C. §1125(a)
(emphasis added).  At the time that Congress was debating this statute, "the 1988 presidential campaign
was in full swing and the candidates were exchanging strident charges of misrepresentation.  The addition
of the word 'commercial' was meant to protect political candidates from civil liability under [§1125(a)]."
2 Jerome Gilson, Trademark Protection and Practice §7.02[6][d] at 7-67 (2002).  As Representative
Kastenmeier, the House co-sponsor of the legislation, explained:
> Political advertising and promotion is political speech, and therefore not encompassed by
> the term "commercial."  This is true whether what is being promoted is an individual
> candidacy for public office, or a particular political issue or point of view.  It is true
> regardless of whether the promoter is an individual or a forprofit entity.  However, if a
> political or other similar organization engages in business conduct incidental to its political
> functions, then the business conduct would be considered "commercial" and would fall
> within the confines of [§1125(a)].

134 Cong. Rec. at H10,421 (daily ed. Oct. 19. 1988); see also Semco, Inc. v. Amcast, Inc., 52 F.3d 108,
11-12 (6th Cir. 1995) (examining the legislative history of §1125(a) and noting that, while the Senate had
a "more narrow" view of the First Amendment, both houses agreed that the provision "exclud[ed] political
speech").  It is highly likely that the underlying First Amendment contours of the "commercial use"
requirement for false designation, contained in §1125(a), are coextensive with the First Amendment
borders described by the "noncommercial use" exemption to Trademark dilution, contained in §1125(c).
In other words, just as Congress used the word "commercial" to preclude false designation claims against
political candidates engaged in political speech, Congress used the word "noncommercial" to preclude
Trademark dilution claims against political candidates engaged in political speech.

wanted to use plaintiff's mark "to identify [itself] as part of the same political organization or party as [the plaintiff organization] – the party that championed the Perot candidacy" – the court enjoined the defendant from infringing plaintiff's mark. United We Stand America, 128 F.3d at 92. And in Finley, even though the defendants were engaged in political campaigning, the court enjoined the defendants from using a deceptive mark. Finley, 512 F. Supp. at 699 (referring to law of infringement).

These courts were all careful to point out, however, that the defendant was using the plaintiff's mark as a source identifier, and not as a means to communicate a message. See Planned Parenthood, 1997 WL 133313 at *10 ("[d]efendant's use of another entity's mark is entitled to First Amendment protection when his use of that mark is part of a communicative message, not when it is used to identify the source of the product"); United We Stand America, 128 F.3d at 92 (defendant is "using the Mark not as a commentary on its owner, but instead as a source identifier"); Finley, 512 F. Supp. at 698 ("the [REP] acronym is not the expression of ideas at all or if it is, it is the deliberately false expression to the voters that defendants are Republicans"). AFLAC is certainly correct that the First Amendment "is not a license to trammel on legally recognized rights in intellectual property." Dallas Cowboys Cheerleaders, 600 F.2d at 1188. But this proposition only goes so far. "When another's trademark (or a confusingly similar mark) is used without permission for the purpose of source identification, the trademark law generally prevails over the First Amendment. Free speech rights do not extend to labeling or advertising products in a manner that conflicts with the trademark rights of others." Yankee Publishing, Inc. v. News America Publishing, Inc., 809 F. Supp. 267, 276 (S.D.N.Y. 1992) (emphasis in original). But when "unauthorized use of another's mark is part of a communicative message and not a source identifier, the First Amendment is implicated in opposition to the trademark right." Id.

Indeed, in every case cited by AFLAC for the proposition that courts may enjoin political speech based, the defendant was using a mark virtually or completely identical to the plaintiff's: Planned Parenthood and www.plannedparenthood.com; Jews For Jesus and www.jewsforjesus.org; United We Stand America and United We Stand America New York; Pink Panther and Pink Panther; Rep. and REP; Michelob and Michelob Oily;[19] Brach's and Brach's; Mutual of Omaha and Mutant of Omaha;[20] Olympic and Olympic.[21]  In all of these cases, moreover, the courts primarily relied on findings of infringement to justify entry of an injunction.  The few cases that mention dilution in support of their holdings did so only in the alternative – after ruling that an injunction was appropriate due to infringement and blatant misappropriation of the marks at issue.  See Mattel, 296 F.3d at 904 (comparing the different First Amendment implications of these different injunctions).

Simply, none of the cases AFLAC cites is similar to this one.  In this case, Hagan is not using the name AFLAC, or the website www.aflac.com, or even the AFLAC Duck, to identify himself or his political

---

[19]  Anheuser-Busch, Inc. v. Balducci Publications, 28 F.3d 769, 774 (8th Cir. 1994).

[20]  Mutual of Omaha Ins. Co. v. Novak, 836 F.2d 397, 398 (8th Cir. 1987).

[21]  San Francisco Arts & Athletics, Inc. v. United States Olympic Comm., 483 U.S. 522 (1987). In this case, the plaintiff sought to advance gay rights by promoting an event called the "Gay Olympic Games."  This case is not entirely on point, because Congress had passed a special law granting to the defendant exclusive use of the term "Olympic," thereby granting "protection [that] may exceed the traditional rights of a trademark owner." Id. at 540.  Regardless, the Supreme Court found the injunction did not implicate the First Amendment because the plaintiff had borrowed the mark wholesale, making the "possibility for confusion . . . obvious." Id. at 539.  AFLAC also cites Walt Disney Productions v. The Air Pirates, 581 F.2d 751 (9th Cir. 1978), which is somewhat off-point because it is a copyright case.  In Air Pirates, the court enjoined distribution of a comic book parody depicting Mickey Mouse, Donald Duck, and other famous Disney cartoon characters.  AFLAC suggests this case, too, stands for the proposition that the First Amendment does not bar issuance of injunctive relief barring expressive speech.  Like every other case cited by AFLAC, however, Air Pirates involved "outright copying of the original work" without consent. Id. at 754.

28

views.  Unlike the above cases, there is no use of a "bogus" website address or other element of misdirection.  <u>Jews For Jesus</u>, 993 F. Supp. 291 (defendant refers to his website as "my bogus 'Jews for Jesus site").  Rather, Hagan is using a quacking cartoon character, which admittedly brings to mind AFLAC's marks, <u>as part of his communicative message,</u> in the context of expressing political speech.  The TaftQuack character explicitly calls Hagan's political opponent a "quack," and accuses him of "ducking" the issues.[22]  In the marketplace of goods, use of another's trademark to identify the source of your own product is trademark infringement and a violation of the Lanham Act.  The same is true in the marketplace of ideas – use of another's trademark to identify the source of your own political views is simple trademark infringement.  On the other hand, in the marketplace of goods, use of another's trademark <u>as part of a communicative message</u> (e.g., my product is better than Joe's®) is allowed.[23]  Hagan is not, moreover, attempting to market anything other than his own ideas through the website.  <u>Cf.</u> <u>Mutual of Omaha</u>, 836 F.2d at 398 (defendant placed marks on "sweatshirts, caps, buttons, and coffee mugs, which he has offered for sale at retail shops, exhibitions, and fairs"); <u>Planned Parenthood</u>, 1997 WL 133313 at *1 (defendant used his website not only to espouse his anti-abortion views but also to "plug" his books and to let the public know he "is available for interview and speaking engagements"); <u>Jews for Jesus</u>, 993 F. Supp. at 291 (defendant's website included a hypertext link to an organization that "offers for sale certain items, including audio tapes and books").

_____

[22]  The Court disagrees with AFLAC's counsel's contention that the TaftQuack character is "not communicating any political message" and "simply . . . serves as a symbol to identify the campaign." Injunction hearing tr. at 14.

[23]  The Lanham Act specifically excludes certain conduct from coverage, including "[f]air use of a famous mark by another person in comparative commercial advertising or promotion to identify the competing goods or services of the owner of a famous mark."  11 U.S.C. §1125(c)(4)(A).

The legislative history of §1125(c)(4)(B) makes clear that, at least with respect to political speech, the same is true in the marketplace of ideas.

It appears incontestable that Hagan <u>intended</u> that the TaftQuack character would imitate the AFLAC Duck, so that Hagan could go "coattail riding," <u>National City Bank of Cleveland v. National City Window Cleaning Co.</u>, 190 N.E.2d 437, 439 (Ohio 1963) – that is, "get attention" and perhaps "avoid the drudgery in working up something fresh." <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 580 (1994) (discussing parody). And it is entirely understandable that AFLAC would object to Hagan's trading off of its own hard work and expense. But AFLAC "does not own in gross the penumbral customer awareness of its name, nor the fallout from its advertising." <u>Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.</u>, 625 F. Supp. 48, 56 (D. N.M. 1985), <u>affirmed</u>, 828 F.2d 1482 (10ᵗʰ Cir. 1987) (refusing to enjoin defendant's use of mark "Lardashe Jeans"). That the consuming public may associate the AFLAC Duck and the TaftQuack character – a proposition the Court accepts – is an insufficient predicate to support injunctive relief of political speech. The First Amendment protects Hagan from AFLAC's dilution claim under the Lanham Act. And, of course, the First Amendment provides this protection from AFLAC's dilution claim under state law, as well. Accordingly, the Court concludes that Hagan shows no likelihood of success on the merits of his dilution claims.


### D. Other Factors.

As noted earlier, "[a]lthough no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." <u>Gonzales</u>, 225 F.3d at 625. This case is not the unusual case.

Conceivably, if AFLAC could show a very high likelihood that it would suffer extreme, irreparable injury without the injunction, the balance would swing in AFLAC's favor. But AFLAC has not adduced any evidence of such an injury. Furthermore, the fourth factor – whether the public interest would be served by issuance of the injunction – tends to weigh in favor of Hagan, given that Hagan's speech is essentially political while AFLAC's is essentially commercial.

In sum, the Court concludes that AFLAC has not demonstrated entitlement to the extraordinary relief it seeks. Accordingly, the motion for preliminary injunction must be denied.


E. Mootness.

The Court concludes its analysis with an observation about mootness. Given that the Ohio gubernatorial contest will be decided in less than two weeks, the issues raised by the parties could conceivably become moot. When asked about this question at the preliminary injunction hearing, however, counsel for the parties essentially agreed that, even after the election, the issues would not become moot because, among other reasons, the issues are "capable of repetition, but evading review." Murphy v. Hunt, 455 U.S. 478, 482 (1982).

In particular, the precise same issues that are raised in this case also arose in a controversy between AFLAC and former Georgia United States Senator Mack Mattingly. During a campaign for reelection, Senator Mattingly used television commercials with a white duck that quacked "Back Mack." The case resolved when the parties agreed to entry of a permanent injunction against the Senator. American Family Life v. Mattingly, case no. 00-CV-2636 (N.D. Ga. Oct. 11, 2000). Given this history, the popularity of

the AFLAC Duck, and the array of similar campaign slogans that might be used,[24] AFLAC's claims are certainly capable of repetition. Furthermore, it is usually the case that political commercials have a short life, commencing several weeks before election (at the earliest) and ending immediately thereafter. The appellate process, however, usually takes much longer. Thus, the type of claims AFLAC brings in this case will consistently evade review, absent the exception to the mootness doctrine applied in <u>Hunt</u>.

In sum, the Court concludes that the Ohio gubernatorial election – regardless of its outcome – will not moot the issues in this case. Furthermore, the issues addressed at the injunction hearing did not include AFLAC's contention that it suffered money damages. Thus, AFLAC remains entitled to a trial on the merits for both its infringement-type claims and its dilution claims. Accordingly, counsel for the parties are directed to appear on November 20, 2002, at 10:00 a.m., for a status conference, to establish a discovery schedule and set a trial date.

**IT IS SO ORDERED.**

<u>s/Kathleen M. O'Malley</u>
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

---

[24] AFLAC might consider itself lucky that Senator Mattingly's opponent did not use a duck quacking "Sack Mack."